Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

HO KAN CHEUNG, derivatively on behalf of WEBTOON ENTERTAINMENT INC.,

Plaintiff,

v.

JUNKOO KIM, DAVID J. LEE, NANCY DUBUC, NAMSUN KIM, HAEJIN LEE, JUN MASUDA, and ISABELLE WINKLES,

Defendants,

and

WEBTOON ENTERTAINMENT INC.,

Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Ho Kan Cheung ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Webtoon Entertainment Inc. ("Webtoon" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Junkoo Kim ("J. Kim"), David J. Lee ("D. Lee"), Nancy Dubuc ("Dubuc"), Namsun Kim ("N. Kim"), Haejin Lee ("H. Lee"), Jun Masuda ("Masuda"), and Isabelle Winkles ("Winkles") (collectively, the "Individual Defendants," and together with Webtoon, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Webtoon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against the Individual Defendants for contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Webtoon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from June 27, 2024 through August 8, 2024, inclusive (the "Relevant Period").

2. Founded in 2005 by Defendant J. Kim, Webtoon represents itself to be "a

global storytelling platform where a vibrant community of creators and users discover, create and share new content."[1] The Company focuses on, *inter alia*, mobile webcomics and visual storytelling. Webtoon is a majority-owned subsidiary of the South Korean internet conglomerate, NAVER Corporation ("NAVER").

3. On June 27, 2024, Webtoon filed its prospectus on Form 424B4 (the "Prospectus") with the SEC in connection with its initial public offering (the "IPO"), which formed part of its registration statement (collectively, the "Registration Statement"). In its IPO, Webtoon sold 16,371,549 shares of common stock at a price of $21.00 per share for net proceeds of approximately $308.5 million. Purportedly, these IPO proceeds were to be used for general corporate purposes, including capital expenditures, operating expenses, and working capital.

4. However, Defendants failed to disclose in the Registration Statement, among other things, that the Company had experienced a deceleration in advertising revenue growth and IP adaptations revenue, thereby making Defendants' rosy representations about the Company's business, operations, and prospects materially false and misleading.

5. The truth emerged on August 8, 2024 when, after the market closed, the Company disclosed its financial results for the second quarter of 2024, which had ended just days after the closing of the IPO. That day, Webtoon disclosed revenue of $321 million, representing total revenue growth of only 0.1%, and reported a quarterly net loss of $76.6 million, or 70 cents. In addition, Webtoon disclosed ***advertising revenue declined 3.6%*** and ***IP adaptations revenue declined 3.7%.*** In discussing these results, Webtoon stated that its revenue and revenue growth had been "offset by the Company's significant exposure to weaker foreign currencies."

6. On this news, the Company's stock price fell $7.88 per share, or 38.2%, from a closing price of $20.63 per share on August 8, 2024 to close at a price of $12.75 per share

1 https://www.sec.gov/Archives/edgar/data/1997859/000119312524151708/d396527ds1.htm#toc396527_10a

on August 9, 2024.

7. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3) Webtoon faced exposure to weaker foreign currencies which offset revenue growth. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

9. Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

10. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), and all of its directors to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Webtoon is headquartered in this District.

**PARTIES**

**Plaintiff**

17. Plaintiff is a current shareholder of Webtoon. Plaintiff has continuously held Webtoon common stock at all relevant times.

**Nominal Defendant Webtoon**

18. Webtoon is a Delaware corporation with its headquarters at 5700 Wilshire Blvd., Suite 220, Los Angeles, CA 90036. Webtoon's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "WBTN."

**Defendant J. Kim**

19. Defendant J. Kim founded Webtoon and has served as the Company's CEO and Chairman of the Board since September 2016. He also serves as Chair of the Nominating and Corporate Governance Committee. Defendant J. Kim joined NAVER as a developer in 2004.

20. For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant J. Kim received $10,345,557 in total compensation from the Company. This included $595,825 in salary, $159,122 in bonus, $8,906,610 in stock awards, and $684,000 in non-equity incentive plan compensation.

21. The Registration Statement stated the following about Defendant J. Kim:

> ***Junkoo Kim***. Junkoo Kim is the founder of our Company and has served as a member of our board of directors and Chief Executive Officer since September 2016. Mr. Kim also serves as the Chief Executive Officer of NAVER WEBTOON since May 2017. Mr. Kim joined NAVER (then known as Search Solution Corp.) as a developer in 2004 and has over 19 years of experience in comics or digital content. Mr. Kim received his Bachelor of Science in Applied Chemistry from Seoul National University. We believe that Mr. Kim's extensive leadership experience, skills and background qualify him to serve as a member of our board of directors.

**Defendant D. Lee**

22. Defendant D. Lee has served as the Company's CFO and COO since November 2023 and as a Company director since April 2024.

23. For the 2023 Fiscal Year, Defendant D. Lee received $5,436,004 in total compensation from the Company. This included $63,462 in salary, $600,000 in bonus, $1,446,944 in stock awards, and $3,325,598 in option awards.

24. The Registration Statement stated the following about Defendant D. Lee:

> ***David J. Lee***. David J. Lee joined our Company as Chief Financial Officer and Chief Operating Officer in November 2023, has been a member of our board of directors since April 2024, and oversees WEBTOON's, Wattpad's and Wattpad WEBTOON Studios' global corporate, financial and operations teams. Mr. Lee has over two decades of experience across retail and consumer industries driving business transformation, supply chain optimization, operations and finance. Mr. Lee previously served as (i) President of AppHarvest, Inc., a leading AgTech and sustainable food company building some of the country's largest indoor farms, leveraging cutting-edge technology, from January 2021 to November 2022 and thereafter served on its board through November 2023, (ii) the Chief Financial Officer and Chief Operating Officer of Impossible Foods Inc. from December 2015 to January 2021 and from December 2015 to March 2019, respectively, where he led the business functions to transform it from a pre-revenue to hyper-growth company with global sales and a comprehensive commercial manufacturing and supply chain capability, and (iii) Chief Financial Officer at Zynga Inc. from April 2014 to December 2015 and was responsible for leading the finance and corporate development teams. He also served as Senior Vice President of Corporate Finance and Strategy for Best Buy Co. Inc. from December 2012 to April 2014, and as Senior Vice President of Consumer Products along with various other roles at Del Monte Foods Inc. from February 2004 to December 2012, where he ran the global food business. Earlier in his career, Mr. Lee worked at Leo Burnett Worldwide, Inc., an advertising company, worked and spent time helping to turn around PG&E during the California Energy Crisis as Director of Strategic Planning serving as strategy consultant at McKinsey & Company, and also spent time in venture capital investing at EPVC. Mr. Lee has also been serving as founder and board chair of Inevitable Tech, Inc., a private company pioneering technology and plant science, since December 2022 and was its CEO from December 2022 to October 2023. Mr. Lee also has served on the board of directors for Zevia PBC, a public growth beverage company, and Benson Hill, Inc., a publicly traded food technology company, from July 2022 and from January 2021, respectively. He is also a Fellow at the Council of Korean Americans and the Network of Korean American Leaders. Mr. Lee received

> a Bachelor of Arts in Government from Harvard College and a Master of Business Administration from the University of Chicago. We believe that Mr. Lee is qualified to serve as a member of our board of directors, given his extensive experience in the consumer-packaged goods industry, operations and supply chain management, business transformation, financial expertise, including serving as chief financial officer, strategy development, ESG matters, and governance experience, as well as his leadership on public boards.

**Defendant Dubuc**

25. Defendant Dubuc has served as a Company director since May 2024. Defendant Dubuc currently serves as the Board's Lead Independent Director and also serves as a member of the Audit Committee and Compensation Committee.

26. The Registration Statement stated the following about Defendant Dubuc:

> ***Nancy Dubuc***. Nancy Dubuc has been a member of our board of directors since May 2024. Ms. Dubuc has also been serving as a member of the board of directors and chair of the audit committee of Warner Music Group Corporation since July 2021, and on the board of directors of Flutter Entertainment Plc since April 2021, serving as a member of its audit committee, nomination committee, compensation committee and remuneration committee. From May 2018 to February 2023, Ms. Dubuc held the position of Chief Executive Officer of Vice Media, LLC. She also served several positions at A&E Television Networks, LLC from November 1999 to April 2018, including her position as President and Chief Executive Officer from 2013 to 2018. Her engagement with the media, digital and publishing industries started earlier in her career, when she served various positions at Lifetime Entertainment Services, Big Rock Productions and WGBH Educational Foundation Inc. Ms. Dubuc received her B.S. in Communication from Boston University in 1991. We believe that Ms. Dubuc is qualified to serve on our board of directors based on her more than 25 years of experience in media, digital and publishing industries and her extensive experience in senior leadership with strong expertise in leading financial and operational transformations of global businesses.

**Defendant N. Kim**

27. Defendant N. Kim has served as a Company director since May 2024. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. He has also served as the CFO of NAVER since March 2022, where he purportedly oversees corporate and business development, strategy, investments/M&A and global growth initiatives. Defendant N. Kim previously joined NAVER in 2020 to lead corporate development and strategic investments and also served as the Webtoon's CFO from March 2022 to October 2023.

28. The Registration Statement stated the following about Defendant N. Kim:

> ***Namsun Kim***. Namsun Kim has served as a member of our board of directors since May 2024. He has served as Chief Financial Officer of NAVER since March 2022, where he also oversees corporate and business development, strategy, investments/M&A and global growth initiatives. Prior to his role as Chief Financial Officer, Mr. Kim joined NAVER in 2020 to lead corporate development and strategic investments, and also led the finance function for WEBTOON including as our Chief Financial Officer from March 2022 to October 2023. Prior to joining NAVER, Mr. Kim led Private Equity Investments in Korea at Macquarie Group from April 2017 to July 2020, during which time he served on the boards of ADT Korea (c/k/a SK Shieldus, a leading security and dispatch provider) and LG CNS (a leading IT services provider and LG Group affiliate). Between 2012 and 2017, he held several investment banking positions at Morgan Stanley and Lazard across New York, Hong Kong and Seoul. Earlier in his career, Mr. Kim was a corporate attorney at Cravath, Swaine & Moore LLP. Mr. Kim received a Bachelor of Science degree in Materials Science & Engineering from Seoul National University and a Juris Doctor degree from Harvard Law School. We believe Mr. Kim is qualified to serve on our board of directors based on his knowledge of our company, global business experience, financial expertise and experience serving on corporate boards.

**Defendant H. Lee**

29. Defendant H. Lee has served as a Company director since October 2020. He also serves as the Chair of the Compensation Committee. Defendant H. Lee also co-founded NAVER in 1999 and served on NAVER's board of directors from 1999 until March 2017. He currently serves as NAVER's Global Investment Officer.

30. The Registration Statement stated the following about Defendant H. Lee:

> ***Haejin Lee***. Haejin Lee has served as a member of our board of directors since October 2020. Mr. Lee also serves as the Global Investment Officer of NAVER since May 2017. Mr. Lee co-founded NAVER in June 1999 and served as chair of the board of NAVER from November 2005 until March 2017. Prior to co-founding NAVER, from February 1992 to June 1999, Mr. Lee served in several roles at Samsung SDS Co., Ltd., an information technology services provider. Mr. Lee received a Bachelor of Science degree in computer science from Seoul National University and a Master of Science in computer science from Korea Advanced Institute of Science and Technology. We believe that Mr. Lee is qualified to serve on our board of directors based on his extensive industry expertise and leadership experience.

**Defendant Masuda**

31. Defendant Masuda has served as a Company director since October 2020. He also serves as a member of the Nominating and Corporate Governance Committee.

32. The Registration Statement stated the following about Defendant Masuda:

> ***Jun Masuda***. Jun Masuda has been a member of our board of directors since October 2020. He has also served as a member of the board directors of LDF since August 2020 and Executive Corporate Officer and Entertainment Company CEO at LY Corporation since October 2023. Previously, Mr. Masuda served as President and Representative Director, Chief Product Officer of Z Entertainment Corporation, formerly a subsidiary of Z Holdings Corporation ("Z Holdings"), between April 2021 and September 2023 and Director and Senior Managing Corporate Officer of Z Holdings between March 2021 to September 2023. We believe that Mr. Masuda is qualified to serve on our board of directors based on his knowledge of our company and leadership experiences.

**Defendant Winkles**

33. Defendant Winkles has served as a Company director since April 2024. She also serves as Chair of the Audit Committee.

34. The Registration Statement stated the following about Defendant Winkles:

***Isabelle Winkles***. Isabelle Winkles has been a member of our board of directors since April 2024 and has been the Chief Financial Officer of Braze, Inc., a publicly traded platform technology company, since January 2020. Previously, she was the Vice President, Finance and Chief of Staff to the Chief Financial Officer of Cognizant Technologies Solutions Corp., a professional services company, from April 2018 to January 2020. Ms. Winkles also served in various roles at Morgan Stanley & Co. from July 2000 to April 2018, including as Managing Director from January 2016 to April 2018. During her tenure at Morgan Stanley & Co., she held a number of operating roles including Head of Legal Entity Management, Head of Financial Planning & Analysis and Treasurer to some of the largest legal entities. Ms. Winkles received her M.B.A. from Harvard University and her B.S. from the Massachusetts Institute of Technology. We believe that Ms. Winkles is qualified to serve on our board of directors based on her extensive experience in large scale strategic cross functional initiatives.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35. By reason of their positions as officers, directors, and/or fiduciaries of Webtoon and because of their ability to control the business and corporate affairs of Webtoon, the Individual Defendants owed Webtoon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Webtoon in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Webtoon and its shareholders so as to benefit all shareholders equally.

36. Each director and officer of the Company owes to Webtoon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

37. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Webtoon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38. To discharge their duties, the officers and directors of Webtoon were required

to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Webtoon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

40. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's Class A common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

41. To discharge their duties, the officers and directors of the Company were

required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Webtoon were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Webtoon's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Webtoon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Webtoon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Webtoon's operations would comply with all applicable laws and Webtoon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders

at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42. Each of the Individual Defendants further owed to Webtoon and the shareholders the duty of loyalty requiring that each favor Webtoon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

43. At all times relevant hereto, the Individual Defendants were the agents of each other and of Webtoon and were at all times acting within the course and scope of such agency.

44. Because of their advisory, executive, managerial, directorial, and controlling positions with Webtoon, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

45. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Webtoon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

48. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Webtoon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

50. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Webtoon and was at all times acting within the course and scope of such agency.

## **WEBTOON'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

***Webtoon's Code of Conduct***

51. Webtoon's Code of Ethics (the "Code of Conduct") states that "[a]ll directors, officers and employees are required to be familiar with the Code, comply with its provisions and report any suspected violations as described below."

52. With respect to the Code of Conduct's adoption, the Code of Conduct states:

> The Board of Directors (the "Board") of WEBTOON Entertainment Inc. (together with its subsidiaries, the "Company") has adopted this Code of Ethics (the "Code") in order to deter wrongdoing and promote: 1. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; 2. full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company; 3. compliance with applicable governmental laws, rules and regulations; 4. protection of the Company assets, including corporate opportunities and confidential information; 5. fair dealing practices; 6. the prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and 7. accountability for adherence to the Code.

53. In a section titled Honest and Ethical Conduct, the Code of Conduct states:

> The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically. Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in their dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom they have contact in the course of performing their job.

54. In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A conflict of interest occurs when an individual's private interest (or the interests of a member of their family) interferes, or even appears to interfere, with the interests of the Company as a whole. A conflict of interest can arise when an employee, officer or director (or a member of their family) takes actions or has interests that may make it difficult to perform their work for the Company objectively and effectively. Conflicts of interest also arise when an employee, officer or director (or a member of their family) receives improper personal benefits as a result of their position in the Company.

> Loans by the Company to, or guarantees by the Company of, obligations of directors, officers, employees or their family members are of special concern. Loans by the Company to, or guarantees by the Company of, obligations of any director or executive officer (or their family members) are expressly prohibited.
>
> Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided unless specifically authorized as described in the paragraph below.

55. In a section titled "Corporate Opportunities," the Code of Conduct states the following, in relevant part:

> All directors, officers and employees owe a duty to the Company to advance its interests when the opportunity to do so arises. Directors, officers and employees are prohibited from taking for themselves personally opportunities that are discovered through the use of Company property, information or position. Directors, officers and employees may not use Company property, information or position for personal gain. In addition, no director, officer or employee may compete with the Company.

56. In a section titled "Confidentiality," the Code of Conduct states the following, in relevant part:

> Directors, officers and employees should maintain the confidentiality of information entrusted to them by the Company or by its customers or partners, except when disclosure is authorized or legally mandated or, in certain circumstances, permitted by law. Confidential information includes all non-public information that might be of use to the Company's competitors, or harmful to the Company or its customers or partners if disclosed.

57. In a section titled "Fair Dealing," the Code of Conduct states the following, in relevant part:

> Each director, officer and employee must deal fairly with the Company's customers, suppliers, competitors, partners, service providers, employees and anyone else with whom they have contact in the course of performing their job. No director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

58. In a section titled "Disclosure," the Code of Conduct states the following, in

relevant part:

> The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules. Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

59. In a section titled "Compliance," the Code of Conduct states the following, in relevant part:

> Directors, officers and employees should comply, both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates. Although not all directors, officers and employees are expected to know the details of all applicable laws, rules and regulations, it is important to know enough to determine when to seek advice from appropriate personnel. Questions about compliance should be addressed to the Legal Department. Insider trading is unethical, illegal and a violation of the Company's Insider Trading Policy.

60. In a section titled "Waivers," the Code of Conduct states:

> The Board (in the case of a violation by a director or executive officer) or the General Counsel (in the case of a violation by any other person) may, in its discretion, waive any violation of this Code.
>
> Any waiver for a director or an executive officer shall be disclosed as required by SEC and NASDAQ rules.

61. In a section titled "Enforcement," the Code of Conduct states:

> The Company must ensure prompt and consistent action against violations of this Code. If, after investigating a report of an alleged prohibited action by a director or executive officer, the Audit Committee determines that a violation of this Code has occurred, the Audit Committee will report such determination to the Board. If, after investigating a report of an alleged prohibited action by any other person, the relevant supervisor determines that a violation of this Code has occurred, the supervisor will report such determination to the General Counsel. Upon receipt of a determination that there has been a violation of this Code, the Board or the General Counsel will take such

> preventative or disciplinary action as it deems appropriate, including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities.

***Webtoon's Corporate Governance Guidelines***

62. Webtoon also maintains Corporate Governance Guidelines (the "Governance Guidelines"). In a section titled "Purpose," the Governance Guidelines state:

> The board of directors (the "Board") of WEBTOON Entertainment Inc. (the "Company") has adopted these Corporate Governance Guidelines (these "Guidelines") as a general framework to assist the Board in carrying out its responsibility for the business and affairs of the Company to be managed by or under the direction of the Board. The Board's principal responsibility is one of oversight. Management of the Company is responsible for implementing the Company's strategic plan; identifying and managing risk; making and keeping the books and records of the Company; preparing the Company's financial statements and determining that they are complete, accurate, and in accordance with generally accepted accounting principles; establishing satisfactory disclosure controls and internal control over financial reporting; and timely reporting to the Board. The independent auditor is responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

63. In a section titled "Board Duties and Responsibilities," the Governance Guidelines state:

> A director is expected to discharge such director's duties, including duties as a member of a committee on which the director serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company. The authority and responsibilities of the Board will include:
>
> 1. Strategic Plan: To set the direction of the Company and monitor management to ensure that the Company achieves its objectives; and to review, monitor and approve the overall operating, financial and strategic plans, operating goals and performance of the Company.
>
> 2. Reporting and Compliance Systems. To ensure that Company management

maintains an effective system for timely reporting to the Board or appropriate Board committees and to the public as required on the following: (1) the Company's financial and business plans, strategies and objectives; (2) the financial results and condition of the Company and its business segments; (3) significant accounting, regulatory, competitive, litigation and other issues affecting the Company; and (4) systems of control which promote accurate and timely reporting of financial information to stockholders and compliance with laws and corporate policies.

3. Risk Oversight. To understand the principal risks associated with the Company's business on an ongoing basis, and oversee the key risk decisions of management, which includes comprehending the appropriate balance between risks and rewards.

4. Disclose Relationships. To disclose promptly to the Board any existing or proposed relationships with the Company (other than service as a Board member or on Board committees) which could be required to be disclosed or could affect the independence of the director under applicable listing standards, including direct relationships between the Company and the director and the director's family members, and indirect relationships between the Company and any business, nonprofit or other organization in which the director is a general partner or manager, officer, or significant stockholder, or is materially financially interested.

5. Stockholder Engagement: To ensure that the Company maintains an active dialogue with stockholders so that their perspectives are thoughtfully considered; and to review stockholder proposals properly submitted and, based on the recommendations of the Nominating and Corporate Governance Committee, respond as appropriate.

6. Annual Stockholders' Meeting: To attend the Company's annual stockholders' meeting unless unusual circumstances make attendance impractical.

7. Corporate Culture: To devise and maintain a human capital management system and a corporate culture that promote compliance with legal and regulatory requirements and the ethical conduct of the Company's business.

8. Sustainability: To promote the long-term sustainable growth of the Company, including considering the social and environmental goals of the Company.

> 9. Compensation: To select, evaluate, and compensate the Company's CEO and other executive officers and to approve the compensation of directors, based on the recommendations of the Compensation Committee.
>
> 10. Management Succession Planning. To approve, based on the recommendations of the Nominating and Corporate Governance Committee, a CEO succession plan.
>
> 11. Board Evaluation. To review the results of the annual board evaluation conducted by the Nominating and Corporate Governance Committee to determine whether the Board and its committees are functioning effectively.
>
> 12. Corporate Governance Documents: To review and approve any amendments to the Company's certificate of incorporation, bylaws, code of ethics, these corporate governance guidelines, and other corporate governance policies, based on the recommendations of the Nominating and Corporate Governance Committee.

64. In violation of the Code of Conduct and the Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Securities Act and the Exchange Act. Also, in violation of the Governance Guidelines, the Individual Defendants failed to maintain the accuracy of Webtoon's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

***Webtoon's Audit Committee Charter***

65. Webtoon's Audit Committee Charter states that the purpose of the Audit Committee is as follows:

> The purpose of the Audit Committee (the "Audit Committee") is to oversee the accounting and financial reporting processes of WEBTOON Entertainment Inc. (the "Company") and the audits of the Company's

> financial statements.
>
> In fulfilling its purpose, the Audit Committee is responsible for maintaining free and open communication between itself and the independent auditor, internal auditor function and management of the Company, and for determining that all parties are aware of their responsibilities.
>
> The Audit Committee's principal responsibility is one of oversight. Management of the Company is responsible for preparing the Company's financial statements, determining that they are complete, accurate, and in accordance with U.S. generally accepted accounting principles ("GAAP") and establishing satisfactory disclosure controls and internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and the effectiveness of the Company's internal control over financial reporting. The Company's internal and outside counsel are responsible for assuring compliance with laws and regulations and the Company's corporate governance policies.

66. The Audit Committee Charter states that, regarding audit services and problems, the duties and responsibilities of the Audit Committee are as follows:

> 1. Auditor Appointment: To (1) appoint, retain or replace an independent registered public accounting firm to act as the Company's independent auditor for the purpose of auditing the Company's annual financial statements, books, records, accounts and internal controls over financial reporting or performing other audit, review or attest services for the Company; (2) set the compensation of the Company's independent auditor; (3) approve all audit engagement fees and terms; (4) oversee the work done by the Company's independent auditor; and (5) terminate the Company's independent auditor, if necessary. The independent auditor shall report directly to the Audit Committee.
>
> 2. Pre-Approval: To pre-approve all audit and permitted non-audit and tax services that may be provided by the Company's independent auditor, and establish policies and procedures for the Audit Committee's pre-approval of permitted services in compliance with applicable SEC rules and review such pre-approval policies at least quarterly.
>
> 3. Audit: To review and discuss with the Company's independent auditor (1) the auditor's responsibilities under generally accepted auditing standards and the responsibilities of management in the audit process; (2) the overall audit

> strategy, planning and staffing; (3) the scope and timing of the annual audit; (4) any significant risks identified during the independent auditor's risk assessment procedures; and (5) when completed, the results, including significant findings, of the annual audit.
>
> 4. Audit Problems: To review and discuss with the Company's independent auditor and management (1) any audit problems or difficulties, including difficulties encountered by the Company's independent auditor or internal audit department during their audit work (such as restrictions on the scope of their activities or their access of information); (2) any significant disagreements with management; and (3) management's response to these problems, difficulties or disagreements; and to resolve any disagreements between the Company's independent auditor or internal audit department and management.
>
> 5. Critical Audit Matters: To engage in a dialogue with the independent auditor to understand the nature of each identified critical audit matter, the auditor's basis for identifying a matter as a critical audit matter and how each such identified matter will be described in the auditor's report.
>
> 6. Internal Audit: To review, discuss with the Company's independent auditor, and approve the functions of the Company's internal audit department, including its purpose, authority, organization, responsibilities, budget and staffing; and to review the scope and performance of the department's internal audit plan, including the results of any internal audits, any reports to management and management's response to those reports or internal audit department; and to review and approve the hiring, dismissal, evaluation and compensation of the senior employee in charge of the internal audit function.

67. The Audit Committee Charter states that, regarding internal controls and risk oversight, the duties and responsibilities of the Audit Committee are as follows:

> 7. Internal Controls: To review with management, internal audit, and the Company's independent auditor the adequacy and effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies, material weaknesses or other major issues in the design or operation of, and any material changes in, the Company's controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditor disclosure

> relating to the Company's controls, management's and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K (the "Form 10-K" ) or quarterly report on Form 10-Q (the "Form 10-Q"), as applicable.
>
> 8. Risk Oversight: To review and discuss with management the risks faced by the Company and the policies, guidelines and process by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risks and the steps management has taken to monitor and control such exposures.

68. The Audit Committee Charter states that, with respect to the Company's financial results, financial statements, and earnings releases, the duties and responsibilities of the Audit Committee are as follows:

> 9. Annual Financials: To review and discuss with the Company's independent auditor and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the independent auditor on the financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Form 10-K before the Form 10-K is filed. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.
>
> 10. Quarterly Financials: To review and discuss with the Company's independent auditor and management the Company's quarterly financial statements (including the related notes) and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's Form 10-Q before the Form 10-Q is filed.
>
> 11. Earnings Releases: To review and discuss with management and the Company's independent auditor: (1) the Company's earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information; and (2) any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made. Such discussions may be general (consisting of

> discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which the Company provides earnings guidance need not be discussed in advance.
>
> 12. Financial Statements Issues: To review with management and the Company's independent auditor: (1) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (2) analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements; (4) consideration of the judgment of both management and the independent auditor about the quality, not just the acceptability, of accounting principles; and (5) the completeness and clarity of the disclosures in the financial statements.

69. The Audit Committee Charter also lists the following duties and responsibilities of the Audit Committee, in relevant part:

> 20. Code of Ethics: To monitor compliance with the Company's Code of Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code.
>
> 21. Related Party Transactions: To (1) review, approve and oversee any transaction between the Company and any related person (as defined in Item 404 of Regulation S-K) on an ongoing basis, in accordance with Company policies and procedures, including the Company's Related Party Transactions Policy; (2) keep the Company's independent auditor informed of the Audit Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company and whether any member of the Audit Committee has concerns regarding relationships or transactions with related persons and, if so, the substance of those concerns; and (3) review and discuss with the Company's independent auditor the independent auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

22. Legal Compliance: To (1) review, with the General Counsel and outside legal counsel, legal and regulatory matters relating to the Company and its subsidiaries that could have a significant impact on the Company's financial statements; (2) review the Company's compliance with applicable laws and regulations; and (3) review and oversee the Company's policies, procedures and programs designed to promote and monitor legal and regulatory compliance and sustainability.

23. Whistleblowers: To establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

24. Tax Planning: To review with management the Company's policies and processes for tax planning and compliance.

25. Audit Committee Performance Evaluation: To conduct an annual evaluation of the performance of its duties under this Charter and present the results of the evaluation to the Board. The Audit Committee shall conduct this evaluation in such manner as it deems appropriate.

26. Audit Committee Charter Review: To review this Charter at least annually and recommend any proposed changes to the Board for approval.

70. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act and the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

71. Founded in 2005 by Defendant J. Kim, Webtoon represents itself to be "a global storytelling platform where a vibrant community of creators and users discover, create and share new content."[2] The Company focuses on, *inter alia*, mobile webcomics and visual storytelling.

**False and Misleading Registration Statement and Prospectus**

72. On May 31, 2024, Webtoon filed its registration statement on Form S-1 with the SEC, which forms part of the Registration Statement.

73. On June 17, 2024, Webtoon filed its final amendment to the registration statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The following day, the Registration Statement was declared effective. Pursuant to the SEC's rules and regulations, Defendants were required to disclose in the Registration Statement known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on Webtoon's continuing operations.

74. On June 27, 2024, Webtoon filed the Prospectus with the SEC, which forms part of the Registration Statement. The Registration Statement was signed by Defendants J. Kim, D. Lee, H. Lee, N. Kim, Masuda, Winkles, and Dubuc.

75. In its IPO, Webtoon sold 16,371,549 shares of common stock at a price of $21.00 per share for net proceeds of approximately $308.5 million. Purportedly, these IPO proceeds were to be used for general corporate purposes, including capital expenditures, operating expenses, and working capital.

76. With respect to Webtoon's revenue and growth strategy, the Registration Statement represented that the Company's business model was largely driven by IP adaptations and advertisements, stating:

**Our Market Opportunity**

---

[2] https://www.sec.gov/Archives/edgar/data/1997859/000119312524151708/d396527ds1.htm#toc396527_10a

> We see a market opportunity of approximately $130 billion in Paid Content, ***$680 billion in Advertising and $900 billion in our IP Adaptations businesses***.
>
> * * *
>
> ***Advertising***
>
> Our high intent, sought after user base attracts advertisers. As we continue to invest in enhanced advertising products and capabilities, ***we believe that we will be able to increase advertising revenue as we continue to innovate our advertising products and capture an increasing portion of the $680 billion digital advertising market globally.*** For example, according to our April 2024 survey of U.S. users, 80% of our users prefer to watch ads to unlock paid episodes and our users are 2x more likely to pay attention to ads compared to users on Netflix, X, Reddit and Snap.
>
> ***IP Adaptations***
>
> Including all web-comic and web-novel content but excluding Wattpad, we had approximately 725 thousand total titles on our platform as of December 31, 2023. Out of these, over 900 titles were adapted into other content formats outside of web-comic and web-novel as of March 31, 2024, representing less than 1% of our content library and demonstrating significant runway for future adaptations out of our content library.
>
> ***We believe that as our library continues to grow, and we continue to invest in the capabilities to produce IP Adaptations either in-house or with third-party partners, we can capture an increasing portion of the over $900 billion global entertainment industry***.

77. With respect to Webtoon's purported "key strengths," the Registration Statement stated the following, in relevant part:

> *Diversified Business Model.* We generate revenue in multiple ways. ***In the year ended December 31, 2023, 80.2% of our revenue was from Paid Content, 11.3% was from advertising and 8.4% was from IP Adaptations.***
>
> ***Even though we are in the early stage of our adaptation business and have a limited experience in generating substantial revenues from such adaptations, we believe we can further diversify our monetization strategy through IP Adaptations***.

78. With respect to Webtoon's purported "growth strategies," the Registration Statement stated the following, in relevant part:

> *Accelerate the growth of our advertising business* by enhancing our advertising products and reaching new advertisers. We plan to continue to invest in enhancing and diversifying our advertiser product offerings, including engaging and interactive advertising formats, as well as more targeted ad products leveraging the data we have. ***We have seen significant success with our advertising business in Japan and plan to accelerate the growth of our Advertising revenue in North America.*** In fact, according to our April 2024 survey of U.S. users, 80% of Fast Pass users are willing to watch an ad for an episode – indicative of our opportunity to grow our Advertising revenue without detracting from the user experience. In North America, we have historically focused less on growing our advertising business and instead focused on building the core WEBTOON platform around Paid Content. Now that we have established a large and engaged user base in North America, we expect to capitalize on that audience, through both Wattpad and WEBTOON. We also expect to build local advertising sales teams to bring more diverse advertisers onto our platform.

79. With respect to certain risks that could impact Webtoon's growth, the Registration Statement stated the following, in relevant part:

> ***Our growth depends on our ability to innovate and expand our advertising business and to develop effective advertising products.***
>
> We generate a portion of our revenue from advertising on our platform. ***For the three months ended March 31, 2024, our advertising revenue was $37.0 million, accounting for 11.3% of our total revenue for the three months ended March 31, 2024. For the years ended December 31, 2023 and December 31, 2022, our revenue from advertising was $145.5 million and $145.1 million, respectively, accounting for 11.3% and $13.4% of our total revenue for the years ended December 31, 2023 and December 31, 2022***, respectively. Most of our advertisers do not have long-term commitments with us, and many of our advertisers can terminate their contracts with us at any time. advertisers may not continue to do business with us, or they may reduce the budgets they are willing to commit to us, if we do not deliver advertisements in an effective manner or fail to develop effective advertising products, if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives or if they are not satisfied for any other reason. This requires us to effectively leverage digital technology and data analytics to gain new commercial insights and develop targeted marketing and advertising initiatives to reach users. If we are unable to provide advertisers with a suitable return on investment, the demand

for our advertisements may not increase, or may decline, which may impact our revenue and financial results*.* ***In addition, our ability to generate and maintain our advertising revenues depends on a number of factors, including the maintenance and enhancement of our brands, our platform, the scale, engagement and loyalty of our users and the market competition on advertising prices***. We cannot assure you that we will be able to retain existing advertisers or attract new ones. If we are unable to retain and enhance our relationships with advertisers, our business, financial condition and results of operations could be adversely affected.

***We intend to continue to diversify our monetization strategy and increase revenues from IP Adaptations, which may not be successful.***

We currently generate a substantial majority of our revenues from Paid Content distribution. ***We also generate a portion of our revenues from online advertising.*** We plan to strengthen revenue contribution from our other monetization methods, such as monetizing content on our platform via adaptations into film, streaming series and other rich media formats. We currently have various business models for IP Adaptations, including licensing out the rights to adapt content created by certain creators to intellectual property adaptation partners (e.g., studios, publishers, financiers, distributors, producers and potential buyers), participating in the pre-production phase for such adaptations, co-producing or investing in production for such adaptations alongside intellectual property adaptation partners and directly funding the entire project for such adaptations. We are in the early stage of our adaptation business and have a limited track record of, or experience in, generating substantial revenues from such adaptations. ***If our adaptation initiative does not enhance our monetization ability or enable us to develop new approaches to monetization, we may not be able to substantially increase our revenues or recover any associated costs***. In addition, we may in the future introduce new services to further diversify our revenue streams, including services with which we have little or no prior development or operating experience. If these new or enhanced services fail to engage users, customers or content partners, we may fail to attract or retain users or to generate sufficient revenues to justify our investments and our business and operating results may suffer as a result.

Moreover, we may fail to effectively identify and develop popular content on our platform with adaptation potential, properly maintain our existing business relationship with our intellectual property adaptation partners in the

> future or develop new business relationships, our intellectual property adaptation partners may be less likely to source content from and develop business cooperation with us, the occurrence of which could adversely affect our business, financial condition and results of operations.

80. Moreover, with respect to other potential risks impacting Webtoon, including the risk arising from Webtoon's exposure to international currency fluctuations, the Registration Statement stated the following, in relevant part:

> ***Our results of operations, which are reported in U.S. dollars, could be adversely affected if currency exchange rates fluctuate substantially in the future.***
>
> As we continue to expand our international operations, we become more exposed to the effects of fluctuations in currency exchange rates. We incur expenses for employee compensation and other operating expenses at our non-U.S. locations in local currency. Fluctuations in the exchange rates between the U.S. dollar and other currencies could result in the dollar equivalent of our expenses being higher, which may not be offset by additional revenue earned in the local currency. This could have a negative impact on our reported results of operations. To date, we have not engaged in any hedging strategies, and any such strategies, such as forward contracts, options and foreign exchange swaps related to transaction exposures that we may implement in the future to mitigate this risk may not eliminate our exposure to foreign exchange fluctuations. Moreover, the use of hedging instruments may introduce additional risks if we are unable to structure effective hedges with such instruments.
>
> * * *
>
> **Quantitative and Qualitative Disclosures about Market Risk**
>
> We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of foreign currency exchange rates and fluctuations in interest rates.
>
> ***Foreign Currency Exchange Risk***
>
> Our revenue is generated globally in multiple currencies, primarily the Korean won, Japanese yen and U.S. dollar. Our results of current and future operations and cash flows are therefore subject to fluctuations due to changes in foreign

> currency exchange rates. As the impact of foreign currency exchange rates has not been material to our historical operating results, we have not entered into derivative or hedging transactions, but we may do so in the future if our exposure to foreign currency becomes more significant.

81. The Registration Statement also reported Webtoon's financial results, stating the following, in relevant part:

> For the year ended December 31, 2023, we generated revenue of $1,282.7 million, net loss of $144.8 million and Adjusted EBITDA of $11.7 million, representing a net loss margin of (11.3)% and an Adjusted EBITDA Margin of 0.9%. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Non- GAAP Financial Measures."

82. The statements referenced in ¶¶76-81 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3) Webtoon faced exposure to weaker foreign currencies which offset revenue growth. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Emerges

83. The truth emerged on August 8, 2024 when, after the market closed, the Company disclosed its financial results for the second quarter of 2024, which had ended just days after the closing of the IPO. That day, Webtoon disclosed revenue of $321 million, representing total revenue growth of only 0.1%, and reported a quarterly net loss of $76.6 million, or 70 cents. The press release stated the following, in relevant part:

> WEBTOON's total revenue for the three months ended June 30, 2024 increased 0.1% to $321.0 million compared to $320.7 million in the prior year as growth across the business was offset by the Company's significant exposure to weaker foreign currencies including the Korean won and Japanese yen, the latter of which reached historically low levels against the U.S. dollar.

> On a constant currency basis, this translated to robust double digit revenue growth of 11.1%, with growth drivers across all revenue streams globally.
>
> In Paid Content, revenue of $260.7 million grew 1.0%, or 11.5% on a constant currency basis. This was driven by robust, double digit revenue growth on a constant currency basis in Rest of World as well as Japan, which is the Company's largest market, following successful execution of user conversion strategies. During the second quarter, total MAUs of 166.3 million and MPUs of 7.8 million remained relatively stable compared to the prior year. The Company also strengthened its leadership position in Japan, with MPUs growing 15.5% compared to the second quarter of 2023, supporting a record high MPU and Paying Ratio. In Korea, user engagement metrics showed improvement towards the end of the quarter following the initial roll out of the platform's AI-driven personalized recommendation model.
>
> Advertising revenue was down 3.6%, which translated to growth of 2.3% on a constant currency basis. Triple digit revenue growth on a constant currency basis in Japan and double digit revenue growth on a constant currency basis in Rest of World amidst the ongoing capture of a relatively nascent North American market were partially offset by declining ad revenue in Korea, primarily due to the continued strategic diversification of advertising partners and inventory away from parent company, NAVER Corporation. The Company continues to diversify its advertising products and the introduction of pre-roll ads has bolstered performance.
>
> IP Adaptations revenue declined 3.7%, which translated to growth of 24.9% on a constant currency basis, driven by growth in all geographies. The Company remains focused on efforts to strengthen its flywheel through IP adaptations, which support expansion of our user base, enhance the creator ecosystem, and contribute to the overall growth of the platform.

84. On this news, the Company's stock price fell $7.88 per share, or 38.2%, from a closing price of $20.63 per share on August 8, 2024 to close at a price of $12.75 per share on August 9, 2024.

## DAMAGES TO WEBTOON

85. As a direct and proximate result of the Individual Defendants' conduct, Webtoon has lost and will continue to lose and expend many millions of dollars.

86. Such expenditures include, but are not limited to, legal fees, costs, and any

payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

87. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

88. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

89. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

90. As a direct and proximate result of the Individual Defendants' conduct, Webtoon has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

91. Plaintiff brings this action derivatively and for the benefit of Webtoon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Webtoon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 11(f) of the Securities Act and 21D of the Exchange Act against the Individual Defendants.

92. Webtoon is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93. Plaintiff is, and has been at all relevant times, a shareholder of Webtoon. Plaintiff will adequately and fairly represent the interests of Webtoon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

94. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

95. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Webtoon's Board consisted of the following seven individuals: Defendants J. Kim, H. Lee, N. Kim, Masuda, D. Lee, Winkles, and Dubuc (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants that were on the Board at the time this action was filed.

96. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

97. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Webtoon to issue materially false and misleading statements. Specifically, the Director-Defendants caused Webtoon to issue false and misleading statements which were intended to make Webtoon appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

98. Additional reasons that demand on Defendant J. Kim is futile follow.

Defendant J. Kim founded Webtoon in 2005 and has served as the Company's CEO and as a Company director since September 2016. He also serves as Chairman of the Board. Defendant J. Kim also joined NAVER as a developer in 2004. As such, the Company provides Defendant J. Kim with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and Chairman of the Board, Defendant J. Kim was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period. In addition, as the Company's highest officer and Chairman of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and misleading Registration Statement. Moreover, Defendant J. Kim is named as a defendant in the Securities Class Action. For these reasons, Defendant J. Kim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

99. Additional reasons that demand on Defendant D. Lee is futile follow. Defendant D. Lee has served as the Company's CFO and COO since November 2023 and as a Company director since April 2024. As such, the Company provides Defendant D. Lee with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As one of the Company's highest officers and as a trusted Company director, Defendant D. Lee conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed the false and misleading Registration Statement. Moreover, Defendant D. Lee is named as a defendant in the Securities Class Action. For these reasons,

Defendant D. Lee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100. Additional reasons that demand on Defendant H. Lee is futile follow. Defendant H. Lee has served as a Company director since October 2020. He also serves as the Chair of the Compensation Committee. Defendant H. Lee also co-founded NAVER in 1999 and served on NAVER's board of directors from 1999 until March 2017. He currently served as NAVER's Global Investment Officer. Thus, as the Company admits, Defendant H. Lee is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading Registration Statement. Moreover, Defendant H. Lee is named as a defendant in the Securities Class Action. For these reasons, Defendant H. Lee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

101. Additional reasons that demand on Defendant N. Kim is futile follow. Defendant N. Kim has served as a Company director since May 2024. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. He has also served as the CFO of NAVER since March 2022, where he purportedly oversees corporate and business development, strategy, investments/M&A and global growth initiatives. Defendant N. Kim previously joined NAVER in 2020 to lead corporate development and strategic investments and also served as the Webtoon's CFO from March 2022 to October 2023. The Company admits that Defendant N. Kim is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and

misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading Registration Statement. Moreover, Defendant N. Kim is named as a defendant in the Securities Class Action. For these reasons, Defendant N. Kim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

102. Additional reasons that demand on Defendant Masuda is futile follow. Defendant Masuda has served as a Company director since October 2020. He also serves as a member of the Nominating and Corporate Governance Committee. The Company admits that Defendant Masuda is a non-independent director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading Registration Statement. Moreover, Defendant Masuda is named as a defendant in the Securities Class Action. For these reasons, Defendant Masuda breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103. Additional reasons that demand on Defendant Winkles is futile follow. Defendant Winkles has served as a Company director since April 2024. She also serves as Chair of the Audit Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, she signed the false and misleading Registration Statement. Moreover, Defendant Winkles is named as a defendant in the Securities Class Action. For these

reasons, Defendant Winkles breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

104. Additional reasons that demand on Defendant Dubuc is futile follow. Defendant Dubuc has served as a Company director since May 2024. Defendant Dubuc currently serves as the Board's Lead Independent Director and also serves as a member of the Audit Committee and Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, she signed the false and misleading Registration Statement. Moreover, Defendant Dubuc is named as a defendant in the Securities Class Action. For these reasons, Defendant Dubuc breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

105. Additional reasons that demand on the Board is futile follow.

106. The Director-Defendants mentioned in the chart below materially benefited from the issuance of the materially false and misleading Registration Statement, through the receipt of restricted stock units ("RSUs") and stock options. The receipt of these RSUs and stock options by these Director-Defendants was contingent upon the closing of the IPO, which would not have closed but for the false and misleading Registration Statement. In total, the Director-Defendants received the following:

| **NAME** | **GRANT DATE** | **WHAT DID THEY RECEIVE?** |
|---|---|---|
| **Nancy Dubuc** | **6/26/2024** | **20,010 RSUs**; The accompanying Form 3 filed with the SEC on 6/26/2024 states that these RSUs "each entitle the reporting person to receive one share of common stock upon vesting. **The RSUs will vest, assuming closing of the Issuer's [IPO], in 1/12th installments on the last day of each of the successive three month periods immediately following May 10, 2024, subject to continued** |

| | | |
|---|---|---|
| | | **employment through such date"** |
| **David J. Lee** | **6/26/2024** | **299,581 RSUs;** The accompanying Form 3 filed with the SEC on 6/26/2024 states that these RSUs "each entitle the reporting person to receive one share of common stock upon vesting. Assuming closing of the Issuer's [IPO], 71,161 and 228,420 RSUs vested or will vest in 1/12th installments on the last day of each of the successive three-month periods immediately following November 1, 2023 an April 12, 2024, respectively, subject to continued employment through each such date." |
| **David J. Lee** | **6/26/2024** | **593,010 Options (ISO);** The accompanying Form 3 filed with the SEC on 6/26/2024 states: "The reported securities vested or will vest in 1/12th installments on the last day of each successive three-month period immediately following November 1, 2023, subject to continued employment with the Company through each vesting date." |
| **Haejin Lee** | **6/26/2024** | **2,832,270 Options**; The accompanying Form 3 filed with the SEC on 6/26/2024 states: "The reported securities will vest, assuming consummation of the Issuer's IPO, subject to continued employment through such date." |
| **Isabelle Winkles** | **6/26/2024** | **22,140 RSUs**; The accompanying Form 3 filed with the SEC on 6/26/2024 states that these RSUs "each entitle the reporting person to receive one share of common stock upon vesting. The RSUs will vest, assuming closing of the Issuer's IPO, in 1/12th installments on the last day of each of the successive three month periods immediately following April 12, 2024, subject to continued employment through each such date." |
| **Namsun Kim** | **6/26/2024** | **21,000 Options**; The accompanying Form 3 filed with the SEC on 6/26/2024 states: "The reported securities will vest, assuming consummation of the Issuer's IPO, on February 28, 2026, subject to continued employment through such date." |
| **Junkoo Kim** | **6/26/2024** | **882,474 RSUs**; The accompanying Form 3 filed with the SEC on 6/26/2024 states that these RSUs "each entitle the Reporting Person to receive one share of common stock upon vesting. 438,030 of the RSUs will fully vest at the closing of the IPO, and 444,444 of the RSUs will vest on January 1, 2025, assuming continued employment through each such date." |
| **Junkoo Kim** | **6/26/2024** | **3,461,670 Options**; The accompanying Form 3 filed with the SEC on 6/26/2024 states: "The reported securities will fully vest at the closing of the IPO, assuming continued employment through such date" |

Thus, Defendants J. Kim, N. Kim, Winkles, H. Lee, D. Lee, and Dubuc each received material personal benefits from the closing of the IPO, which occurred pursuant to the false

and misleading Registration Statement, making them unlikely to take action with respect to the means by which these benefits were received. For these reasons, too, demand on these Director-Defendants would be futile.

107. With respect to conflicts of interest potentially arising from Defendants H. Lee's and N. Kim's executive officer positions with NAVER, the Registration Statement stated the following:

> Because of their current or former positions with NAVER, certain of our executive officers and directors own equity interests in NAVER. Continuing ownership of shares of NAVER common stock and equity awards could create, or appear to create, actual or potential conflicts of interest if we and NAVER face decisions that could have implications for both companies following the completion of this offering. In addition, certain of NAVER's current executive officers are our directors, and this could create, or appear to create, actual or potential conflicts of interest when we and NAVER encounter opportunities or face decisions that could have implications for both companies following the completion of this offering or in connection with the allocation of such directors' time between us and NAVER. These actual or potential conflicts of interest could arise, for example, over matters such as the desirability of changes in our business and operations, funding and capital matters, regulatory matters and matters arising with respect to various intercompany service agreements with NAVER and its subsidiaries. See "Certain Relationships and Related Party Transactions—Intercompany Services and Property Leases."

For these reasons, too, these conflicts of interest make a demand on Defendants H. Lee and N. Kim further futile.

108. Defendants Dubuc, N. Kim, and Winkles served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and

violations of the Securities Act and Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

109. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Securities Act and Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

110. Webtoon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Webtoon any part of the damages Webtoon suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

111. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's

charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

112. The acts complained of herein constitute violations of fiduciary duties owed by Webtoon's officers and directors, and these acts are incapable of ratification.

113. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Webtoon. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Webtoon, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

114. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Webtoon to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

115. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand

with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

116. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

118. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

119. Under the direction and watch of the Director-Defendants, the Registration Statement failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors would adhere to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the Registration Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

120. The Registration Statement also failed to disclose that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3) Webtoon faced exposure to weaker foreign currencies which offset revenue growth. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

121. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Registration Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Registration Statement, including but not limited to _____.

122. As a result of the material misstatements and omissions contained in the Registration Statement, Company shareholders voted, *inter* alia, to _______.

123. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Registration Statement.

124. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

125. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Webtoon's business and affairs.

127. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

128. The Individual Defendants' conduct set forth herein was due to their

intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Webtoon.

129. In breach of their fiduciary duties owed to Webtoon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Webtoon had undergone a deceleration in advertising revenue growth; (2) Webtoon had undergone a deceleration in IP adaptations revenue; and (3) Webtoon faced exposure to weaker foreign currencies which offset revenue growth. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

130. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

131. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

132. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Webtoon's securities.

133. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to

fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Webtoon's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

134. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Webtoon has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

136. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

**THIRD CLAIM**

**Against the Individual Defendants for Unjust Enrichment**

137. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Webtoon.

139. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Webtoon that was tied to the performance or artificially inflated valuation of Webtoon, or received compensation or other payments that were unjust in light of the Individual Defendants' bad

faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

140. Plaintiff, as a shareholder and a representative of Webtoon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

141. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## FOURTH CLAIM
## Against the Individual Defendants for Abuse of Control

142. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Webtoon, for which they are legally responsible.

144. As a direct and proximate result of the Individual Defendants' abuse of control, Webtoon has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

145. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

## FIFTH CLAIM
## Against the Individual Defendants for Gross Mismanagement

146. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Webtoon in a manner consistent with the operations of a publicly held corporation.

148. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Webtoon has sustained and will continue to sustain significant damages.

149. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

150. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

**SIXTH CLAIM**

**Against Individual Defendants for Waste of Corporate Assets**

151. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

153. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Webtoon to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

154. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

155. Plaintiff, on behalf of Webtoon, has no adequate remedy at law.

**SEVENTH CLAIM**

**Against the Individual Defendants for Contribution Under Sections 11(f) of the Securities Act and 21D of the Exchange Act**

156. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157. As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Webtoon shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

158. Federal law provides Webtoon with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

159. The plaintiff in the Securities Class Action alleges that the Registration Statement issued in connection with the Company's IPO contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

160. Webtoon is the registrant for the IPO. The Individual Defendants were responsible for the contents and dissemination of the Registration Statement.

161. As issuer of the shares, Webtoon is strictly liable to the class action plaintiff and the class for the misstatements and omissions.

162. The plaintiff in the Securities Class Action alleges that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

163. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Webtoon, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Webtoon, including the wrongful acts complained of herein and in the Securities Class Action.

164. Accordingly, the Individual Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs

the application of a private right of action for contribution arising out of violations of the Exchange Act.

165. As such, Webtoon is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Webtoon, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Webtoon;

(c) Determining and awarding to Webtoon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Webtoon and the Individual Defendants to take all necessary actions to reform and improve Webtoon's corporate governance and internal procedures to comply with applicable laws and to protect Webtoon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Webtoon to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of

compliance with applicable laws, rules, and regulations;

(e) Awarding Webtoon restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 15, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest

Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

**VERIFICATION**

I, Ho Kan Cheung, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of November, 2024.

Signed by:
HO KAN CHEUNG
DDAF6BF7D173475...
Ho Kan Cheung